IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,            :

        Plaintiff,                  :

                               Case No. 3:09cr139

        vs.                         :

                               JUDGE WALTER HERBERT RICE

ANTHONY CRAVER,                      :

        Defendant.                  :

---

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO
SUPPRESS EVIDENCE AND STATEMENTS (DOC. #29)

---

Defendant Anthony Craver ("Defendant" or "Craver") is charged in the

Superseding Indictment (Doc. #24) with four counts or offenses, to wit:

1) conspiring to possess with the intent to distribute heroin between in or around

July 22, 2009, and November 24, 2009 (Count One); 2) possessing heroin with

intent to distribute on or about July 22, 2009 (Count Two); 3) possessing a

firearm in furtherance of a drug trafficking crime on or about July 22, 2009 (Count

Three); and 4) possessing heroin with intent to distribute on or about November

24, 2009 (Count Four).  The charges against Craver are related to two encounters

he had with officers from the Dayton Police Department, one on July 22, 2009,

and the other on November 24, 2009.  Counts Two and Three arise out of the

incident of July 22nd, during which police pulled over an automobile in which Craver was a passenger.  Count Four is related to the incident that occurred on November 24th, when Defendant encountered police on the public streets of Dayton.  Count One, the conspiracy charge, stems from both incidents.

Craver has filed a motion requesting that the Court suppress all evidence that was seized as a result of his encounters with police officers on July 22nd and on November 24th, as well as any statements he made to officers during those occasions.  See Doc. #29.  The Court conducted a two-day oral and evidentiary hearing on Craver's request to suppress evidence and statements.  See Transcript of February 19, 2010 Hearing (Doc. #33) ("Tr. I") and Transcript of February 22, 2010 Hearing (Doc. #34) ("Tr. II").  The parties have now filed their post-hearing memoranda, see Docs. ##35 and 38, and this matter is ripe for a ruling.[1]  As this case concerns two separate incidents with unrelated facts, the Court rules upon the instant motion in the following manner: The July 22nd incident is discussed first, wherein the Court begins by setting forth its factual findings, as drawn from evidence and testimony presented at the hearing, before turning to its analysis and ruling.  The Court will then address the encounter between Craver and the officers on November 24th in the same fashion.

---

[1]The Defendant did not submit a reply memorandum in support of his request to suppress evidence and statements, although the Court authorized filing of such.

The July 22nd Incident

On July 22, 2009, Detective Gregory Gaier ("Gaier") of the Dayton Police Department received a tip from a known, confidential informant that a murder suspect for whom there was an active arrest warrant, D'Alcapone Alpacino Morris ("Morris"), was present or would be present that day at a residence within the 1500 block of West First Street in Dayton.  Tr. I at 6.  The confidential informant providing this tip had worked with Gaier for about a year, and had previously supplied information that resulted in the issuance of warrants, the discovery of evidence and arrests.  Id. at 34.  The tip did not specify the exact address where Morris would be located, but instead, provided a general description of a house and identified a vehicle that would be parked out front.  Id. at 68-69.  Gaier went to the scene and found a vehicle, a white sedan, that he believed was the one identified in the tip.  Id.  As it happened, the vehicle was not parked directly in front of a house, but rather, on the curb space corresponding to the area between two houses that were both similar in appearance to the one the informant had described to Gaier.  As a result, Gaier was not certain which one the informant had meant, but nevertheless, concluded that Morris was probably inside one of the two houses, or would arrive at one of them shortly.  Id. at 69–70.

By noon, there were at least four officers in the area, occupying three separate vehicles.  Gaier, who had primary responsibility for the Morris investigation, had positioned his unmarked car part of the way down the block, so that Morris would be unlikely to see him while going to or coming from one of the

residences.  He requested that Officers Jeffrey Watkins ("Watkins") and Jason Tipton ("Tipton"), partners in a marked police cruiser, report to the area to back him up.  Gaier requested their help, so that a readily identifiable police vehicle would be available in the event that a traffic stop became necessary.  Id. at 7–8. Watkins and Tipton parked their cruiser near the intersection of Third and Broadway, such that they were near enough to First Street that they could quickly catch up to a car leaving the area, but were not visible from the suspect's presumed location.  Id.  Gaier communicated with officers in the marked car over his police radio and, later, via cellular telephone.  Sargent Gary White, who is in charge of the homicide unit and is Gaier's supervisor, was on Edison street working on an unrelated matter.  However, because he was monitoring his police radio, he knew of Gaier's investigation on First Street, and intended to make himself available in the event officers located the homicide suspect.

At approximately 1:30 p.m., Gaier saw two black males in the area of the houses, although he was not certain that they had actually come from either house.  Id. at 9–10.  He saw the men get into a purple Cadillac that was parked in the area, pull away from the curb, and begin traveling westbound on First Street. The driver of the car was Jose Natera ("Natera"), and Craver was the passenger. Because the men were in the vicinity of the house, where, according to the confidential informant, Morris was located, Gaier was concerned that either Natera or Craver might be that suspect.  Gaier observed them from some distance, having positioned his car further down the street to avoid being seen.  Id. at 11–12.  From

the distance and angle of his position, Gaier could not see the faces of either man, but thought them somewhat similar to Morris in height and build.[2] Id. Thus, because he "could not determine that those individuals were not … Morris," Gaier wanted the Cadillac stopped "to verify that Mr. Morris was or was not inside of the vehicle." Id. at 11. To that end, Gaier pulled out and began following the car. Soon after, it made a right turn onto James H. McGee Boulevard, and, in so doing, Gaier observed the Cadillac fail to use its turn signal. Id. at 10.

Gaier radioed Tipton and Watkins immediately after pulling away to follow the Cadillac, informing them that the vehicle needed to be stopped by their marked cruiser. Gaier also attempted to inform Tipton and Watkins of the traffic violation, but, as he was doing this, his radio battery lost power, causing it to go dead. Id. at 9–10. Before his radio lost power, Watkins told Gaier to contact him via cell phone. Gaier did so, describing the car to Watkins, and recounting the turn signal violation. Id. at 12–13. Around the same time, Sargent White, who had picked up Gaier's initial broadcast that he wanted a vehicle stopped, drove his unmarked car onto James H. McGee Boulevard, positioning his vehicle directly behind the purple Cadillac. Tr. I at 10 and Tr. II at 156.

From his position, White began calling out the Cadillac's turns over the police radio, thereby allowing Tipton and Watkins to follow and eventually overtake it. Tr. I at 10. Gaier now took a position several car lengths behind, so as not to arouse the driver's suspicion that the police were following. From James H.

_____

[2]Gaier had seen pictures and descriptions of Morris in police files. Tr. I at 28.

McGee Boulevard, the Cadillac turned right on Gettysburg Avenue, and then again onto Free Pike, such that it was now traveling eastbound.  Almost immediately thereafter, the Cadillac pulled into the parking lot of a McDonald's Restaurant located on Free Pike.  Id.  White was still closest to the car, but he lost sight of it momentarily as it circled around the building to position itself in the drive-thru lane.  Id.  As the Cadillac reemerged, White could see only the driver, whereas he had been able to see both the driver and the passenger, while he had followed that vehicle.  Tr. II at 158.  As Tipton and Watkins pulled into the parking lot and positioned their squad car near the Cadillac, White radioed them with the information that only one person was now visible.  Id. at 159.  The officers confirmed this, and, after Watkins had activated the cruiser's overhead lights, they exited with their weapons drawn and began approaching the Cadillac.  Tipton approached the passenger's side of the car and Watkins the driver's side.  Id. at 130–34.

As Tipton drew closer to the vehicle, he could see Craver lying back, fully reclined in the passenger seat.  Id. at 134–35.  Intermittently, Craver stuck his head up slightly in order to look out the passenger window.  Id.  The officers shouted commands that the men in the Cadillac put their hands up.  Before the Defendant raised his hands, Tipton saw him reach several times for the area of his waistband or pockets.  Id. at 135–37.  The officers ordered both men out of the car.  As Craver exited on the passenger's side, Tipton saw him turn his body away, and again reach for the area of his waistband.  Id.  By this time, although Tipton

realized that the man in front of him was not Morris,[3] he had become concerned that Craver might have a weapon.  Tipton asked him if there was anything on his person of which he should be aware.  Craver responded "Oh man …" and dropped his gaze.  Id. at 139.  Tipton then patted down Craver's body, feeling a hard square object near his waistline, whereupon he yelled out "gun".  Id. at 137.  Watkins went to the passenger's side and removed the gun from Craver's waistband, after Tipton had told him where it was located.  Id. at 137–39.

Craver was handcuffed and placed under arrest for carrying a concealed weapon.  Subsequently, Tipton performed a more thorough search of Craver's person, discovering a plastic bag in Craver's pocket that was filled with capsules later determined to contain heroin.  Id. at 140.  When Gaier arrived at the scene, he and Tipton cooperated in writing Natera a citation for failing to signal a right turn.  Tr. I at 16.

Analysis of the July Incident

The Defendant asserts two bases in arguing that the handgun and heroin must be suppressed as the products of an illegal search or seizure, to wit: 1) that officers did not have a legitimate basis to stop the Cadillac in the first place and, 2) in the alternative, that officers did not have the requisite reasonable suspicion to justify performing a frisk of his person after the car had been stopped.  The Court begins by addressing the standards against which these arguments must be evaluated, after which it applies these standards to the present case.

---

[3]Like Gaier, Tipton had seen Morris's photograph in police records.

An ordinary traffic stop of an automobile acts as a "seizure" of its occupants for purposes of the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 653 (1979).  If a "traffic stop is illegal or the detention exceeds its proper investigative scope, [any] seized items must be excluded [as] 'fruits of the poisonous tree.'"  United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963)).  The Sixth Circuit has held that a "traffic stop [is] akin to an investigative detention … and the principles announced in  Terry v. Ohio, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct" during such a stop.  Hill, 195 F.3d at 264. Accord United States v. Everett, __ F.3d __, 2010 U.S. App. LEXIS 7107 at *8 n.4 (6th Cir. 2010).  The Sixth Circuit has summarized the relevant criteria that apply to an investigative detention or "Terry stop" as follows:

> We recently reviewed the relevant analytical framework for assessing an investigative detention under Terry v. Ohio: "In evaluating the constitutionality of a Terry stop, we engage in a two-part analysis of the reasonableness of the stop."  United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005).  We first ask whether there was a proper basis for the stop … [and] [i]f the stop was proper, "then we must determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Id.

United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006) (additional internal quotation marks and citation omitted).

An officer may initiate a traffic stop if he or she has "probable cause to make a stop for a civil infraction, [or] reasonable suspicion of an ongoing crime to make a stop for a criminal violation."  United States v. Blair, 524 F.3d 740, 748

(6th Cir. 2008); Gaddis v. Redford Twp., 364 F.3d 763, 771 n.6 (6th Cir. 2004).[4]

"Probable cause is a reasonable ground for belief supported by less than prima

facie proof but more than mere suspicion."  Blair, 524 F.3d at 748.  Reasonable

suspicion is a lesser standard than probable cause, but still requires that an officer

have specific and articulable facts that would "warrant a man of reasonable

caution in the belief that" the person stopped is currently, was recently, or will

soon be involved in some kind of criminal activity.  Terry, 392 U.S. at 19–20.  In

the course of conducting a traffic stop, an officer may "perform a 'patdown

[search]' of a driver and any passengers upon reasonable suspicion that they may

be armed and dangerous."  Knowles v. Iowa, 525 U.S. 113, 117 (1998) (citation

omitted).

As a means of analysis, the Court will initially address the question of

whether the officers had a legitimate basis for stopping the Cadillac, before turning

───────────────

[4]Several courts have noted a discrepancy in Sixth Circuit precedents regarding whether a traffic stop requires probable cause or only reasonable suspicion that a traffic violation has occurred.  Compare Weaver v. Shadoan, 340 F.3d 398, 407–08 (6th Cir. 2003) (upholding a traffic stop upon reasonable suspicion that a civil infraction had occurred) with United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) (holding a traffic stop unconstitutional absent probable cause) as discussed in, Blair, 524 F.3d at 748 n.1 and United States v. Simpson, 520 F.3d 531, 539 (6th Cir. 2008).  It appears that Freeman, which required probable cause, is controlling on this point as it is the earlier ruling.  See Simpson, 520 F.3d, at 539 (finding Freeman controlling as the earlier panel decision). See also Salmi v. Sec'y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").  Herein, the Court's analysis is unaffected in any case, because it concludes the higher standard of probable cause has been met as to the traffic violation.

to the issue of whether the scope and duration of the stop violated the Defendant's rights under the Fourth Amendment.

In arguing that officers did not have a legitimate basis for stopping the Cadillac, Defendant's primary contention is that Gaier, having observed Craver and Natera from behind and at a considerable distance, could not have developed a reasonable suspicion that either man was Morris, the wanted homicide suspect. See Doc. #35 at 7–10.  However, reasonable suspicion of criminal activity is just one of the bases upon which an officer may detain a vehicle.  A stop is also appropriate if an officer has probable cause to believe a traffic violation has occurred.  Blair, 524 F.3d at 748.  In the process of following the Cadillac, Gaier noticed that it failed to use its signal while making a right turn onto James H. McGee Boulevard.  Such a traffic violation is governed by § 71.31(A) of the Dayton Municipal Code, which provides in pertinent part:[5]

> No person shall turn a vehicle or trackless trolley or move right or left upon a highway unless and until such person has exercised due care to ascertain that the movement can be made with reasonable safety nor without giving an appropriate signal.

Although Natera testified that he remembers using his turn signal before driving onto James H. McGee Boulevard, the Court credits Gaier's testimony to the extent that it establishes that he had probable cause to believe he had observed Natera committing a traffic violation.  As an initial consideration, Gaier and Natera's contradictory testimony must be evaluated within the context of the

---

[5]Section 4511.39 of the Ohio Revised Code contains the same prohibition.

events that were unfolding. Gaier was following the Cadillac because he believed it might contain a wanted murder suspect whom he was responsible for investigating. By contrast, July 22 was, to that point, a completely ordinary day for Natera, who testified that he had no idea he was being followed by officers or detectives as he drove from First Street to the McDonald's on Free Pike. Tr. II at 205. Thus, of the two, Gaier had a particularly strong incentive to focus intently on the movements and behavior of the Cadillac, whereas Natera had little or none. Additionally, at the hearing, Natera's recollections of most events *other* than his use of the car's signal were patchy and inconsistent.[6] Accordingly, the Court concludes that Gaier was justified in ordering the Cadillac stopped for violating § 71.31(A) of the Dayton Municipal Code because he had probable cause to believe a violation of that provision had occurred.[7]

Undeniably, Gaier's interest in the purple Cadillac was broader than a concern that it had violated Dayton's traffic laws. However, the actual, subjective, intentions behind a police officer's decision to stop a vehicle are irrelevant, as long as the officer has probable cause to believe that a traffic infraction has occurred. Whren v. United States, 517 U.S. 806, 813 (1996). Thus, the Sixth Circuit has

---

[6]For example, Natera was uncertain whether he called Craver or if Craver had called him to arrange to meet that afternoon, Tr. II at 201; he was unable to identify the house where he met Craver when presented with a photograph of same, id. at 217, and, while he testified that he had planned to drop Craver off at a friend's house later on, he could not remember the name of the friend or where that friend lived. Id. at 220.

[7]Gaier also had probable cause to believe that Natera had violated § 4511.39 of the Ohio Revised Code, which is identical to § 71.31(A) of the Dayton Municipal Code.

held that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct." United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002). Herein, Gaier observed a traffic violation and relayed the relevant information to Officers Tipton and Watkins, who actually stopped the vehicle.  Gaier believed that it was preferable for Tipton and Watkins to make the stop, because they were in a marked squad cruiser.  Subsequently, Gaier issued Natera a citation for the turn signal violation.

Having concluded that officers had a legitimate basis for stopping the Cadillac, the Court must next address the proper scope and duration of the stop. See Blair, 524 F.3d at 752 ("Because we assume Officer Holmes had probable cause to stop Blair for a tag-light violation, but hold that he did not have reasonable suspicion to stop Blair for possession of narcotics, we must determine the proper scope and duration of the stop.").  More specifically, as the Defendant does not suggest that the stop took longer than was reasonably required, the relevant inquiry is whether Craver's behavior during the stop justified Tipton in patting down Craver for weapons on his person.[8]

---

[8]The Government argues that two factors justify the patdown search of Craver's person, to wit: 1) Craver's behavior, in that he made several movements toward the area of his waistband or pockets immediately before and during the stop, suggesting that he might have a weapon concealed in that area; and 2) that "officers also possessed one additional piece of information—namely, that a wanted felon may be present in the Cadillac."  Doc. #38 at 15–16.  Because the Court concludes that the first factor was independently sufficient to justify the patdown search, it does not address what role, if any, the homicide investigation might play in justifying Tipton's decision to search Craver for weapons.

After pulling into the McDonald's and activating their overhead lights, Officers Tipton and Watkins exited their cruiser and approached the Cadillac with their guns drawn, ordering its occupants out of the car.  Police officers may, without special circumstances, order both the passenger and driver out of their vehicle during a traffic stop.  Maryland v. Wilson, 519 U.S. 408, 415 (1997).  Once both men were out of the car, Tipton expanded the scope of the traffic stop by patting down Craver for weapons.  This aspect of the Court's inquiry is controlled by the Supreme Court's recent decision in Arizona v. Johnson, __ U.S. __, 129 S. Ct. 781 (2009).  Therein, a unanimous Court held that the standard for a patdown search during a traffic stop mirrors that which was outlined in Terry for an on-the-street encounter, writing:

> To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

Id. at 784.  See also Michigan v. Long, 463 U.S. 1032, 1047–48 (1983) ("[P]olice may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous.").

As Tipton and Watkins approached the Cadillac on foot, shouting commands that its occupants put up their hands, they could observe Craver, lying prone in the reclined passenger seat.  As he drew closer, Tipton saw Craver reach several times for the area of his waistband, before "sluggishly" complying with the command to put his hands up.  Once out of the vehicle, Craver turned his body away from

Tipton, and again moved his hands to the general area of his waistband. Moreover, while Craver was exiting the car, Tipton asked him if he had anything on his person of which he (Tipton) should be aware. Craver responded "Oh man ...," dropping his head down as he spoke.[9] This exchange reinforced Tipton's concern, as he took Craver's response to mean that he did, in fact, have an item or items on his person that he did not want officers to know about.

The Court must consider the totality of the circumstances in determining whether Craver's behavior provided reasonable suspicion to warrant a patdown search. See Alabama v. White, 496 U.S. 325, 331 (1990) ("[The] totality of the circumstances approach [applicable to a determination of probable cause also], applies in the reasonable suspicion context, the only difference being the level of suspicion that must be established."). Considering all of the events, including Craver's repeated movements toward his waistband and his equivocal answer to Tipton's question, the Court concludes that the officer had reasonable suspicion to believe that Carver was armed and dangerous.

The Sixth Circuit has acknowledged that an individual's conduct in reaching toward an area where a weapon might be concealed, as well as hiding or ducking down, can assist in establishing reasonable suspicion that he or she is armed. See

---

[9]To the extent that Defendant is of the opinion that Tipton violated his rights under the Fourth Amendment by asking him if he (Craver) had anything of which Tipton should be aware, this Court rejects that proposition. In United States v. Everett, infra at 16, the Sixth Circuit held that an officer may ask a person detained at a traffic stop questions that are related to officer safety without intruding on that individual's Fourth Amendment rights.

United States v. McDaniel, 2010 U.S. App. LEXIS 6854 at *10 (6th Cir. 2010) (where police initiated a stop of a car that was parked too far from the curb and subsequently saw a passenger "make a furtive movement as if he [were] putting something into his waistband, [they] had a reasonable suspicion that [he] was armed and dangerous."); United States v. McGlown, 150 Fed. Appx. 462, 468 (6th Cir. 2005) (officers had reasonable suspicion where they "observed Defendant place a black object in his waistband, and shortly thereafter … walk[] behind a black Oldsmobile Bravada parked nearby, where he bent down as though he [were] placing something on the ground.") (internal quotation marks and citation omitted); Caruthers, 458 F.3d at 467 ("Bending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved.") (where police observed defendant turn and run upon noticing them, and then "hunch down" behind the wall of a business as they approached).  Herein, officers observed Craver ducking down, and reaching toward his waistband, an area where one might easily conceal a weapon.

Additionally, Craver's response when Tipton asked if there was anything he should know about was of a kind that would likely rouse the anxiety of a reasonable officer.  It bears mentioning, although Defendant does not press the point, that Tipton's putting his question to Craver did not expand the scope of his detention or offend his other constitutional rights.  The Sixth Circuit has recently reaffirmed the importance of permitting questions directed at officer safety:

> [T]he Supreme Court has emphasized that "the safety of the officer" during a traffic stop is a "legitimate and weighty" interest, Pennsylvania v. Mimms, 434 U.S. 106, 110, (1977); accordingly, there has been widespread agreement–both before Muehler and since–that officers conducting a traffic stop may inquire about dangerous weapons.  See [United States v. Chaney, 584 F.3d 20]; United States v. May, 203 F.3d 53, 340 U.S. App. D.C. 183, 1999 WL 1215651, at *3 (D.C. Cir. 1999); [United States v. Holt, 264 F.3d 1215,1223 (10th Cir. 2001).]

Everett, __ F.3d __, 2010 U.S. App. LEXIS 7107 at *28.  See also United States v. Herbin, 343 F.3d 807, 811 (6th Cir. 2003) ("questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention.").

In sum, the factors before Officer Tipton, in combination, not in isolation, gave rise to a reasonable suspicion that Craver was armed and dangerous. Accordingly, it was appropriate for Tipton to pat down the Defendant for weapons. Once the patdown revealed a handgun concealed in Defendant's waistband, an arrest for a weapons offense was proper.  After placing him under arrest, Tipton performed a more extensive search of Craver's person which revealed heroin capsules in his pockets.  Once Craver was under arrest for carrying a concealed weapon, Tipton could perform a more extensive search of his person as a valid search incident to arrest.  See United States v. Gooch, 499 F.3d 596, 604 (6th Cir. 2007) ("Nor were the police prohibited from searching Gooch's person [once they had determined that he was illegally in possession of a firearm.]") (citing Chimel v. California, 395 U.S. 752, 763, (1969) and New York v. Belton, 453 U.S. 454, 462-63, (1981).

Based upon the foregoing, the Court overrules Defendant's Motion to Suppress Evidence and Statements (Doc. #29), as it relates to the incident of July 22, 2009.

The November 24th Incident

On the afternoon of November 24, 2009, Detectives Matthew Beavers ("Beavers") and William Elzholz ("Elzholz") of the Dayton Police Department were in the vicinity of Third Street and James H. McGee Boulevard, conducting an investigation into a robbery of a local business that had occurred two days earlier. Tr. II at 172.  The detectives began by approaching various people in the neighborhood and asking if they had seen anything related to the robbery.[10]  Id. at 173–74.  While standing on the corner, the detectives saw two young men approaching who appeared to fit the description of the robbery suspect, that is, they were African-American males in their early twenties, who were approximately six feet tall and wearing hooded sweatshirts.  Id. at 178.  One of the men was Craver.

As the two approached, Elzholz introduced himself and asked if they would be willing to answer some questions about anything they might have seen in the neighborhood concerning the robbery.  Id.  However, Craver quickly became very agitated and began cursing at the detectives.  He shouted: "Fuck you!  Get the

---

[10]Before encountering Craver, the detectives had interviewed approximately a half-dozen people in this fashion.

fuck away from me: I'm already on federal paper!"  Id. at 177.  Craver also began

reaching up and touching the toboggan hat that he was wearing.  Id. at 178.

Although Elzholz attempted to reassure him that he was not in any trouble and that

the officers simply wanted to ask him some questions, Craver remained agitated

and continued cursing at the officers.  Id.

　　　　As the exchange intensified, Craver began backing away from the officers,

while still touching his toboggan hat.  He then thrust his right hand into his pocket.

Id. at 178.  At that point, fearing that Craver might be attempting to retrieve a

weapon, Beavers backed away to create some separation between himself and

Craver, while Elzholz drew his firearm and ordered Craver to put his hands up.  Id.

Instead, Craver shouted one more obscenity at the officers, before turning and

running in the opposite direction.  Id.

　　　　Beavers immediately pursued Craver as he traveled northeast on Second

Street and toward an alley that runs parallel to First and Second Streets.  Id. at

178.  About one hundred yards down the alley, Beavers observed Craver throw his

toboggan hat over the fence in front of a house.  Id. at 179.  The toboggan hat

appeared weighted down, as it traveled a seemingly abnormal distance after Craver

threw it.  He also saw Craver waving what appeared to be a small pistol.  Id.

Detective Beavers caught up to Craver near the 1500 block of West First Street,

where he was able to physically restrain him and place him in handcuffs.  Id. at

178.  At this point, Beavers did not have his radio with him, so he called his

dispatcher on his cell phone, informing the dispatcher that he (Beavers) had seized

a suspect and needed backup.  Id. at 179.  A uniformed crew soon arrived and took custody of Craver, while Beavers and other detectives began canvassing the area looking for the toboggan hat.

Eventually, Detective Jack Rice discovered the toboggan hat in a yard, and Beavers retrieved it.[11]  Id. at 186.  Inside, they found a large quantity of heroin.  Id. at 182.  The men returned to 1500 West First Street, where Craver was being held in the back of a patrol car.  Detective Beavers then read Craver his Miranda rights. Id.  He proceeded to ask Craver about the gun that he had seen, but Craver denied having a gun.  When asked about the heroin, Craver only responded: "All I'm saying is I didn't have a gun."  Id. at 183.


November 24th Incident Analysis

The Defendant argues that the heroin discovered on November 24th must be suppressed, because its discovery was the result of his being seized, by the officers' show of force, and that said seizure was constitutionally unreasonable under the circumstances.

It is axiomatic that not every encounter between a citizen and a law officer constitutes a seizure, as "[t]he purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  Rather, interactions between the police

---

[11]The detectives also searched for the pistol that Beavers believed he had seen, but a firearm was never recovered.

and citizens fall along a continuum whereby greater intrusions upon individual liberty must be met by more substantial justifications on the part of officers.  As the Sixth Circuit has explained:

> Encounters between police officers and citizens can be grouped into three categories: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary[,] involuntary detention or <u>Terry</u> stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.

<u>United States v. Campbell</u>, 486 F.3d 949, 953–54 (6th Cir. 2007) (internal quotation marks and citation omitted).  The signature characteristic that distinguishes a seizure from a mere consensual encounter is that a seizure occurs when "a reasonable person would have believed that he or she was not free to walk away."  <u>Id</u>. at 955.

It is clear that Craver was not seized by the detectives when they approached him and asked if he would answer some questions about the robbery in the neighborhood.  <u>Florida v. Bostick</u>, 501 U.S. 429, 434-35 (1991) (noting that the Court has repeatedly held that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions") (internal quotation marks and citation omitted).  Craver points out, however, that what begins as a consensual encounter with police may, through an officer's conduct, ripen into a seizure if the circumstances become such that a reasonable person would cease to believe that he or she was free to disregard the officer's questions, end the conversation or simply walk away.  <u>United States v. Foster</u>, 376 F.3d 577,

584 (6th Cir. 2004); United States v. Grant, 920 F.2d 376, 382 (6th Cir. 1990).

Ultimately, by his show of authority (drawing his weapon and ordering Craver to

put his hands up), Elzholz was, in all likelihood, attempting to seize the Defendant.

See Mendenhall, 466 U.S., at 554–55 ("Examples of circumstances that might

indicate a seizure [include] the display of a weapon by an officer."). However,

Craver did not submit to this show of authority and, instead, turned and ran. This

situation is controlled by the Supreme Court's ruling in California v. Hodari D., 499

U.S. 621 (1991), which the Sixth Circuit has summarized as follows:

> In Hodari D., the Supreme Court established the rule that when a suspect
> refuses to submit to a show of authority by the police, the suspect is not
> seized by the police until such time as he or she submits or is forced to
> submit to police authority. [499 U.S.] at 626. As such, because a seizure
> does not occur when a mere show of authority occurs, but only when one
> yields to a show of authority, the fourth amendment does not apply to
> anything one may abandon while fleeing the police in an attempt to avoid a
> seizure. Id. at 629. This rule applies, the Court stated, even when the
> show of authority is an unlawful one. Id. at 624, n.1.

United States v. Martin, 399 F.3d 750, 752 (6th Cir. 2005).

Herein, Craver's assertion that he was seized by the detectives while he

stood on the corner of Third Street and James H. McGee Boulevard is untenable.

The unchallenged testimony of Beavers is that, after their initial exchange grew

heated and Craver became agitated and began reaching into his pocket, Detective

Elzholz drew his firearm, whereupon Craver turned and fled. At some point during

his flight, Craver threw his toboggan hat over a fence, and, eventually, Detective

Beavers caught up to Craver, physically restrained him and put him in handcuffs.

Then, and only then, was Craver seized. Given that Defendant refused to submit

to the officer's show of authority as they faced off near the intersection, anything

that he discarded during his flight from that location, before his eventual apprehension, is "not the fruit of a seizure."  Hodari D, 499 U.S. at 629.[12]

The Court need not inquire further into the legitimacy of the detectives' display of force during their initial encounter with Craver on November 24, despite Craver's argument that they were unjustified in attempting to seize or detain him. Since they did not succeed in seizing Craver until after he had discarded the toboggan hat containing drugs, the acquisition of the same did not result from an illegal seizure, and is not subject to suppression.

Based upon the foregoing, the Court overrules Defendant's Motion to Suppress Evidence and Statements (Doc. #29), as it relates to the incident of November 24, 2009.[13]

Accordingly, the Court overrules Defendant's Motion to Suppress Evidence and Statements (Doc. #29) in its entirety.

---

[12]Although the Defendant does not raise the point, the officers did not violate his Fourth Amendment rights by searching his hat, because that article of clothing had been abandoned.  See e.g., United States v. Robinson, 390 F.3d 853, 873-74 (6th Cir.2004) (noting that "[i]f property has been 'abandoned' … the Fourth Amendment is not violated through the search or seizure of this property").

[13]Parenthetically, Craver argues that any statements he may have made must be suppressed as fruit of illegal searches and seizures, rather than contending that the statements were involuntary or obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  Since this Court has concluded that the Defendant was neither seized nor searched illegally, his statements cannot be suppressed as fruit of an illegal search or seizure.

June 4, 2010

/s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of Record.